No. 2664

Second Circuit

---

ARMOND v. T. & P. R. R. CO.

---

(February 24, 1927. Opinion and Decree.)
(April 8, 1927. Rehearing Refused.)
(May 23, 1927. Decree of Supreme Court on Application for Writ of Certiorari and Review, Refused Writ Because "Under the facts stated by the Court of Appeal we find no error in the judgment".)

---

(*Syllabus by the Editor*)

1. Louisiana Digest—Railroads—Par. 84, 86.

Where the engineer and fireman of a train see a mule upon a high embankment, almost on the track, and in dangerous proximity to it when they were sufficient distance from the mule to avoid the accident, it is clearly their duty to take such precautions to avoid injuring the animal as were reasonable, with due regard to the safety of the train and its passengers.

Appeal from the Tenth Judicial District Court of Louisiana, Parish of Natchitoches. Hon. John F. Stephens, Judge.

Action by J. E. Armond against Texas & Pacific Railway Company.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

J. C. Gunter, of Natchitoches, attorney for plaintiff, appellee.

Peterman, Dear & Peterman, of Alexandria, attorneys for defendant, appellant.

ODOM, J. Plaintiff's mule was killed by one of defendant's trains on August 30, 1925. This suit is to recover the value of the mule.

The District Court found that the animal was killed through the negligence of those in charge of the train, and gave plaintiff judgment for $200.00, the value of the mule, and costs. Defendant appealed.

OPINION

The killing of the mule by defendant's train and its value as found by the District Court are not disputed; but defendant contends that those in charge of its train at the time were guilty of no fault or negligence and that the railway company is therefore not liable.

The mule was killed at night and was found the next morning, its body lying on the dump about two or two and one-half feet from the track, according to the testimony of the section foreman.

This witness testified also that the dump at that place is about twelve feet wide on the top, that there is a space of about three and one-half feet on each side of the track, and that the dump is "somewhere about eight or nine feet, may be

more", high at the place where the mule was killed.

Mr. Troup, the engineer in charge of the train at the time, testified that at the time he first saw the mule he had blown the whistle for the crossing, had shut off the steam, and his train was drifting"; that the mule was killed before he reached the crossing; that it was killed something like a half or three-fourths of a mile from the crossing; that he saw the mule after he blew for the crossing; that he went around a curve just before reaching the place where the mule was killed and could not see the animal until he got on straight track; and that when he reached straight track so that he could see, the mule was about two or three poles away, possibly two poles. And he was asked by the court:

"How far did you tell counsel you were away before you saw the mule, didn't you say three or four poles?"

And he answered:

"I answered, when I got around the straight track I was three or four poles from the bridge, and the mule was pretty close to the bridge; I can't tell you how close he was. I just got through whistling when the mule showed up, when I saw him."

The undisputed testimony is that the mule was killed thirty feet from the bridge. The telegraph poles are one hundred and seventy-six feet apart, so that the engineer, according to one part of his testimony, saw the mule when the train was at least two poles, or three hundred and fifty-two feet from it, and, according to other portions of his testimony, he was at least three poles, or five hundred and

twenty-eight feet, less thirty feet, or four hundred and ninety-eight feet from it.

He says, again, that the curve is about fifteen car lengths from where the mule was killed and that a car is thirty feet long, which would place the curve four hundred and fifty feet from where the mule was killed.

He says that when he first saw the mule it was about eight or ten feet, as near as he could tell, from the track, and he does not recall whether it was standing still or not.

W. E. Waite, the fireman, says the mule was on his side of the track when he saw it; that he was then about three hundred yards from it; that the mule—

"was standing with his front feet off over on the edge of the embankment, with his tail toward the track, and after the engine, or while the engine was passing, he became frightened, and started back in the direction from which the train was coming, and ran, I would judge, twenty-five or thirty feet, wheeled and turned, following us in the direction we was going; in wheeling he stuck his head in between the baggage car and the first day coach, and when he did that the vestibule or some other part of the car struck him in the side, knocking or running him against the other mule which in turn knocked him down."

He says the mule stood still until after the engine had passed him and that the engine, coal car, baggage and mail car had passed him before he was hit.

Accepting the testimony of the section foreman, the engineer and the fireman, all called as witnesses by defendant, as true, we are of the opinion that the company, through its employees, was negligent.

.As we have already noted, the railroad track at the place where the animal was killed is on an embankment or dump some eight or nine feet high. Both the engineer and the fireman say that the mule, when he was first seen by them, was up on the embankment but not on the track. They both state that as best as they could see it was about eight feet from the track. But considering the undisputed testimony that the crown of the embankment is only twelve feet wide and that there is a space of not more than three and a half feet on each side of the track, we conclude that they are mistaken as to the distance the mule was from the rail.

The fireman says that the mule was standing with its front feet over the edge of the dump and with his hind feet next to the rail. Its hind feet, therefore, must have been very near the rail, possibly at the end of the crossties.

The nearness of the animal to the track is also indicated by the testimony of the engineer when he says, in explanation as to how the mule got hurt, that the engine missed it; and by the testimony of the fireman, who says that when the engine passed the mule it became frightened and wheeled and ran back. He does not say that the mule ran up on the embankment, but says that when it turned to run it stuck its head between two cars and was hit by the vestibule. It was, therefore, very close to the track all the time, and while never on the track it was in dangerous proximity thereto.

The mule was not merely on the company's right of way; it was up on a high embankment, almost on the track. The animal was seen in that situation by both the engineer and the fireman when the train was anywhere from three hundred and fifty to four hundred and fifty feet away, according to the engineer, and at approximately twice that distance, according to the testimony of the fireman.

Seeing the animal in dangerous proximity to the track, it was clearly the duty of those in charge of the train to take such precautions to avoid injuring it as were reasonable with due regard to the safety of the train and its passengers.

But the testimony shows that they did absolutely nothing to avoid injuring the animal. When the animal was seen the engineer had already cut off the steam and the train was "drifting" and going at something like twenty-five miles an hour; it was then not making the usual noise. No stock alarm was sounded, the whistle was not blown (it was blown for the crossing, some distance away), the lights were not flashed on and off as is customary to frighten stock off the track; the air cocks were not open; no noise whatever was made to frighten the animal off the track. So noiselessly did the train approach the animal that it did not become frightened until the engine passed it. The brakes were never applied and no effort at all made to slacken the speed of the train or stop it. The train crew seem to have taken it for granted that the animal would see the approaching train and get out of the way. It is not contended that the train crew, after seeing the animal, could not have frightened it off the track or could not have stopped the train with all safety before reaching the animal.

.Counsel for defendant rely upon the rule which, they say, is settled in jurisprudence

and settled by reason, that when an engineer sees an animal not in danger standing safely outside the rails he need not stop his train to see what the animal will do.

Counsel have stated the rule too broadly.

They cite Elliott on Railroads, 3rd edition, volume 3, section 720. That work does not support the rule thus stated.

The rule, as we understand it, is that:

"Where animals are not on but merely in the vicinity of the track, it is not necessary to reduce speed if there are no circumstances making it probable that they will come upon the track or be injured, as when they are grazing quietly or manifesting no indication of coming upon the track."

33 Cyc. 1225, 1226.

According to counsel's understanding of the rule, if an animal is standing by the side of the track and far enough away so that if it stands still it will not be struck by a passing train, no obligation rests upon those in charge of the train to take any precautions for its safety.

The rule so broadly stated by counsel is sanctioned neither by jurisprudence nor reason.

The duty of those in charge of a train when animals are seen in close proximity to the track is stated as follows in 33 Cyc. 1222:

"Where animals are seen on or in dangerous proximity to a railroad track, it is the duty of those in charge of the train to exercise ordinary care to avoid injuring them, and a failure to do so will render the company liable for any injuries occasioned thereby."

(Boldface type ours.)

And, according to the same work (page 1226), after stating it to be the rule that it is not the duty of the engineer to stop his train when animals are in the vicinity of the track, it is further stated:

"But such circumstances do not relieve those in charge of the train from the duty of maintaining a careful lookout as to their subsequent movements; and if it can safely be done the train should be slowed down or stopped whenever there is apparent danger of injury, as where the animal is in dangerous proximity to the tracks * * * or its escape from the immediate vicinity of the tracks would be difficult or impossible because of the presence of fences, embankments or other circumstances, and in such cases the fact that the train could not be stopped after the animal actually got upon the track will not relieve the company of liability if reasonable care demanded that other precautions should have previously been taken."

(Boldface type ours.)

As to the duty to sound the stock alarm, the same work, page 1227, says:

"Ordinarily it is the duty of the engineer to use such precautions to frighten animals as soon as they are discovered on the track, or if they are in dangerous proximity to the track, or the circumstances make it probable that they will come upon it; but if the animal is not on the track and there is no apparent danger, no alarm is necessary."

(Boldface type ours.)

In an elaborate case note found in 23 A. L. R. 150, the general rule governing such cases is stated as follows:

"An engineer need not slacken the speed of his train upon discovering animals near the track, unless there is something to indicate that they may come upon the track, or are in such close proximity thereto that they are likely to be injured."

(Boldface type ours.)

In support of the above rule, there are cited cases from Arkansas, Florida, Colorado, Georgia, Idaho, Illinois, Iowa, Michigan, Mississippi, Missouri, Texas, Utah and West Virginia.

According to the above authorities, it may be stated that where an animal is seen by those in charge of the train in such close proximity to the railroad tracks that it is reasonable to apprehend that injury may result in case the animal becomes frightened, as where it is on a high dump or embankment and within three or four feet of the rail, it is their duty to sound the stock alarm to frighten it away and to check the speed of the train and stop it if such can be done without jeopardizing the safety of the train and its passengers in order to avoid injuring the animal. A failure to do so is such negligence as will make the company liable.

A railroad company is liable for injuries to stock due to the negligence of its servants, and the care to be exercised at particular places and on particular occasions must be commensurate with the danger reasonably to be expected.

The mule in this case was close beside the rail on a high dump or embankment; no attempt was made to frighten it; the steam was cut off and the train "drifted" along the track until the engine passed it; it then became frightened and in its effort to escape it ran back along the edge of the dump and finally turned to go back. When it did so, according to the fireman, it stuck its head between two cars, the vestibule of one of the cars striking it and killing it.

Just such action on the part of the mule was reasonably to be apprehended by those in charge of the train. The train crew had ample opportunity after seeing the mule some three hundred and fifty or four hundred feet away to avoid striking it.

We have not seen fit to discuss the testimony of plaintiff's witnesses nor to state his theory as to how the mule was killed. We think the testimony of defendant's witnesses makes out the case against it.

For the reasons assigned, the judgment appealed from is affirmed, with costs.